

# SUPREME COURT OF MISSOURI
## en banc

PAUL L. PASTERNAK, )
)
     Appellant, )
)
vs. )     No. SC94488
)
DENISE M. PASTERNAK, )
)
    Respondent. )

### APPEAL FROM THE CIRCUIT COURT OF ST. FRANCOIS COUNTY
**Honorable Shawn Ragan McCarver, Judge**

*Opinion issued August 18, 2015*

Paul Pasternak (Father) appeals the trial court's judgment (1) approving relocation by Denise Pasternak (Mother) and (2) modifying custody from joint legal and physical custody to joint physical custody, but giving Mother sole legal custody of the couple's two children. This Court rejects Father's contention that the trial court's determination of both issues was not supported by substantial evidence. Substantial evidence supported the trial court's approval of Mother's relocation and finding that the relocation was sought in good faith. This included evidence that Mother lost her teaching job and found a new job that would require her to move about 56 miles away, that she had identified a good school for the children in the new area, and that the children were familiar with that area and would have a support network there as Mother's family lived nearby.

Substantial evidence also supported the trial court's finding that relocation was in the best interests of the children. This Court rejects Father's argument that the trial court judgment should be reversed because the fact that the children will be 56 miles farther away means that his contact with them will be reduced. It can be in a child's best interests to relocate with a parent to a different community when the trial court determines it is in the child's best interests to continue to live with that particular parent even though that parent's circumstances require the parent to move. Missouri law makes only lack of good faith a determinative factor in deciding whether to allow relocation. Section 452.375.2[1] directs the trial court to weigh a variety of other factors, including frequency of contact, in determining whether relocation is in a child's best interests. Here, the trial court approved a parenting plan that continued to allow the children substantial time with Father, who retained joint physical custody, and the record provides substantial evidence to support the trial court's determination that relocation was proper based on the statutory factors.

The record also contains substantial evidence supporting a change from joint to sole legal custody in Mother based on the evidence that Mother and Father's relationship was so contentious that they could not effectively function, communicate, or make joint decisions regarding the children, and that Father's negative conduct had a deleterious impact on the children. Affirmed.

I.    *STATEMENT OF FACTS AND PROCEDURAL HISTORY*

Father was a teacher at the North County School District in Farmington, Missouri.

---

[1] All statutory citations are to RSMo 2000 unless otherwise indicated.

Mother was a tenured teacher at the Central R-III School District in that same city. Mother and Father dissolved their marriage in September 2011. The judgment of dissolution granted Mother and Father joint legal and joint physical custody of their two minor children: A.J.P., male, aged 6 at the time of the dissolution, and A.P.P., male, aged 3 at the time of the dissolution. The children's primary residence was with Mother, although Father retained the marital home. Both residences were in Farmington. Father had care of the children each week from Wednesday evening until Thursday morning and every other weekend from Friday evening until Monday morning. Mother and Father shared holidays and divided the summer equally, with each parent receiving alternate weeks. Father also received seven days to use at any time so long as he provided certain notice to Mother. In general, Mother attended to the children's appointments, illnesses, and other needs, while Father was the "activities" parent, being highly involved in the children's recreational and extracurricular activities, especially during the summer. Father, but not Mother, was Catholic, and Father arranged for A.J.P. to receive religious training in Catholicism on Wednesday evenings. A.J.P. completed this religious training after the dissolution.

Mother and Father experienced serious difficulties exercising their joint legal and physical custody of the children. A particular conflict between the parents revolved around A.J.P.'s diagnosis of attention deficit hyperactivity disorder (ADHD). Mother supported A.J.P. regularly taking the prescription drug Adderall for his ADHD as directed by his physician. Father did not agree with A.J.P's diagnosis and refused to administer the drug to A.J.P., even after a second opinion confirmed the diagnosis. Only

after a third opinion confirmed the diagnosis did Father reluctantly begin administering the medication during the week, but he continued to refuse to administer it on weekends, contending that a physician stated that it was up to the parents as to whether they administered the medication on weekends. Father also told A.J.P. to inform Mother that A.J.P. would not take the medication and that the medication could cause him to die. Father's statements became a source of great stress to A.J.P, not only because of fear of death but also because Mother and Father gave conflicting instructions with regard to the medication.

In addition, Mother and Father engaged in near-constant arguments and other inappropriate behavior regarding other issues, including, but not limited to:

(1)     Father and Mother, but more so Father, disparaging the other parent in the presence of the children;

(2)     Father disparaging Mother's significant other to the children, resulting in the children making an inappropriate remark to Mother's significant other;

(3)     Father and Mother getting in petty arguments over minor violations of exchange times;

(4)     Father and Mother, but more so Father, giving conflicting instructions to the children's daycare provider;

(5)     Mother refusing to allow Father's relatives to pick up the children for lunch or when Father might have been late due to work commitments;

(6)     Father and Mother disagreeing over whether the children should continue to go to catechism classes in Father's religion or go to Mother's new church;

(7)     Father and Mother, but more so Father, creating embarrassing situations in public places in the presence of children;

(8)     Father and Mother involving police in exchanges that should not require the police if the parents were cooperative;

(9)     Mother setting and arranging appointments without consulting Father, although somewhat necessitated by Father's failure to cooperate;

(10)    Father discussing "alleged inappropriate behavior" of Mother in front of the children;

(11)    Mother engaging in manipulative behavior in an attempt to assert possible sexual abuse by Father, no proof of which was ever offered;

4

(12) Mother failing to send the children to summer school for all scheduled days; and

(13) Mother changing child care providers without consultation with Father.

Mother moved to modify the dissolution judgment, requesting that she be given sole legal and physical custody. Mother highlighted the disagreements between the parties and emphasized Father's resistance to administering A.J.P.'s prescribed medication. Father requested that the dissolution judgment remain unchanged and, during discovery, asked whether Mother intended to relocate the children's residence.

Mother initially stated that she had no intention of relocating. While the motion to modify was pending, however, Mother learned that her teaching contract would not be renewed as a result of work difficulties she began having around the time of the dissolution. She, therefore, resigned and began applying for teaching jobs at other schools in Farmington as well as in other cities in southeast Missouri, including Avery, Bloomfield, Clearwater, Doniphan, Fredericktown, Greenville, Poplar Bluff, and Ste. Genevieve. Mother accepted a position in Greenville with a salary approximately $14,000 less than her salary had been in Farmington. Because of that decrease in salary, Mother believed that she could not afford housing in Farmington or gas for the commute from Farmington. Mother, therefore, planned to live in Silva, which is near Greenville and which is where Mother's parents and other family members live. Silva is 56 miles away from Farmington.

Because she would need to move for her job, in May 2013, while the custody motion was pending, Mother gave Father notice of her intent to relocate the children from Farmington to Silva, as required by section 452.377. Father filed a petition to prohibit

5

relocation and a counter-motion to modify, requesting sole legal and physical custody. Father argued that Mother's proposed relocation would prevent him from maintaining an active role in the children's lives. Mother responded that she was relocating because she lost her job in Farmington and that the children would benefit from being away from Mother and Father's negative relationship and by being closer to her family in Silva.

Mother's proposed relocation and the parties' respective motions to modify proceeded to a bench trial. First, the trial court approved Mother's proposed relocation, finding that Mother's proposal was made in good faith and that relocation was in the best interests of the children. Second, with "relocation being allowed by the [trial court] as well as all of the other facts of this case," the trial court modified legal custody of the children from joint legal custody to sole legal custody in favor of Mother. The trial court concluded that Mother and Father should continue to share joint physical custody of the children.[2] The trial court prepared a modified parenting plan that it found was in the best interests of the children. That plan gave Father 143 overnight visits, including primary physical custody in the summer months, but no longer provided for Wednesday night visitation as distance made that impractical. Father appealed, arguing that the trial court's holdings as to both issues were not supported by substantial evidence. Following an opinion by the court of appeals, this Court granted transfer. *Mo. Const. art. V, § 10.*

## II.    STANDARD OF REVIEW

This Court will affirm the circuit court's judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares

---

[2] Mother also filed a motion for contempt, which the trial court overruled.

6

or applies the law. *Murphy v. Carron, 536 S.W.2d 30, 32 (Mo. banc 1976).* "Substantial evidence is evidence that, if believed, has some probative force on each fact that is necessary to sustain the circuit court's judgment." *Ivie v. Smith, 439 S.W.3d 189, 199 (Mo. banc 2014).* "To prevail on [a] substantial-evidence challenge, [the appellant] must demonstrate that there is no evidence in the record tending to prove a fact that is necessary to sustain the circuit court's judgment as a matter of law." *Id. at 200.* When reviewing whether the circuit court's judgment is supported by substantial evidence, this Court views "the evidence in the light most favorable to the circuit court's judgment and defer[s] to the circuit court's credibility determinations." *Id.* This Court "accept[s] as true the evidence and inferences … favorable to the trial court's decree and disregard[s] all contrary evidence." *Id., quoting Zweig v. Metro. St. Louis Sewer Dist., 412 S.W.3d 223, 231 (Mo. banc 2013).*

## III. *SUBSTANTIAL EVIDENCE SUPPORTS THE TRIAL COURT'S JUDGMENT*

### A. *Trial Court's Decision to Approve Relocation Was Supported by Substantial Evidence*

Father argues that the trial court's decision to approve relocation was not supported by substantial evidence. This Court disagrees. Section 452.377 governs relocation. Section 452.377.1 states: "For purposes of this section and section 452.375, 'relocate' or 'relocation' means a change in the principal residence of a child for a period of ninety days or more, but does not include a temporary absence from the principal residence." Section 452.377.9 states: "The party seeking to relocate shall have the burden of proving that the proposed relocation is made in *good faith* and is in the *best*

7

*interest of the child.*" (Emphasis added.) "Sections 452.377 and 452.375 … are part of a single statutory scheme and must be read together." *Abernathy v. Meier, 45 S.W.3d 917, 924 (Mo. App. 2001).* A relocation analysis, therefore, requires that where, as here, the principal residence is changed for a period of 90 days or more, the trial court must determine whether the proposed relocation (1) is made in good faith and (2) is in the best interest of the children.

### 1. Good Faith Determination

Section 452.377 does not define "good faith," but it "references the relocating parent's motivation or purpose for relocating. In that regard, our appellate courts have essentially defined [good faith] as the relocating parent's motive or purpose for relocating being something other than to disrupt or deprive the non-relocating parent of contact with the children." *Swisher v. Swisher, 124 S.W.3d 477, 481 (Mo. App. 2003).* Father argues that the trial court's determination that Mother's request for relocation was made in good faith was not supported by substantial evidence. This Court disagrees.

Mother presented evidence that she resigned from her job in Farmington when she received notice that her contract was not going to be renewed. That nonrenewal was based on her continued inattention to her work during the period just before, during, and after the dissolution action, despite numerous warnings. While Father claimed that Mother deliberately performed deficiently in her job to give herself an excuse to relocate, Mother denied that she wanted to lose her job and testified that, but for the loss of her job, she would not have applied for permission to relocate. She also testified that, even after she lost her job, she applied for another job in Farmington itself as well as for jobs

8

in nine different school districts; only some of these jobs would have required relocation. The Greenville position was the closer of the two positions that showed an interest and it was located near other family, so she and the children would have a support network. She, therefore, accepted the position.[3]    Because the new job resulted in a significant salary decrease, however, she did not think she could afford the cost of commuting from Farmington, and, therefore, applied for permission to relocate.

Based on this evidence, the trial court said it was "not convinced that Mother intentionally lost her employment or intentionally took a substantial pay cut to arrange a move closer to her significant other or her own parents." It concluded:

> Under the circumstances, given the inability of the parents to effectively communicate, the loss of employment, and the other circumstances of this case, the Court does not believe Mother's request to relocate to the same area where her parents live is made for any bad motive. The Court, therefore, finds that Mother's request to relocate is made in good faith.

Father asks this Court to hold that the trial court's holding that the relocation was made in good faith was not based on substantial evidence. In support, he points to contrary evidence he presented that he believes shows that Mother is not credible, that she fabricated the need for the move by purposely losing her job, and that this conduct shows that Mother's real motive for relocation was to remove Father from the children's day-to-day lives.

---

[3] One of the other districts to which Mother applied was Potosi. Potosi had no posted openings at the time of Mother's application, however, and when she was offered the Greenville position she accepted it. Potosi later called Mother to offer her an interview, but as that did not occur until after she had accepted the Greenville position, and as she would have to pay a penalty to withdraw from Greenville after acceptance and she had no way of knowing whether the Potosi position would result in a job, Mother did not follow up on the possible Potosi position.

Father's argument that the existence of this contrary evidence requires reversal is inconsistent with this Court's standard of review. In considering whether there was substantial evidence to support a trial court's judgment, this Court disregards contrary evidence and instead considers only the evidence supporting the judgment, including the reasonable inferences from that evidence, in deciding whether the judgment was supported by substantial evidence. *Ivie, 439 S.W.3d at 200.*[4] The trial court was free to and did reject Father's arguments regarding Mother's credibility and motivation. This Court will not second-guess those determinations. *Id.*; *Zweig, 412 S.W.3d at 231*; *Sch. Dist. of Kansas City v. State, 317 S.W.3d 599, 604 (Mo. banc 2010)*; *Watson v. Mense, 298 S.W.3d 521, 525-26 (Mo. banc 2009).*

## 2. Best Interests Determination

Father alternatively argues that the trial court's approval of the relocation was not supported by substantial evidence because the best interests of the children would be served by maintaining more frequent contact with both parents. But this argument would mean that relocation would seldom be approved as, by its nature, relocation farther from

---

[4] In his brief, several of Father's points combined the argument that the trial court's judgment was not supported by substantial evidence with an argument that the trial court's judgment was against the weight of the evidence. In *Ivie,* this Court specifically reaffirmed that whether a judgment is against the weight of the evidence is a separate question from whether it is supported by substantial evidence, and that both arguments may not be combined in a single point because they rely on inconsistent premises: the argument that a judgment is against the weight of the evidence presupposes that there was substantial evidence but it was outweighed. *439 S.W.3d at 199, n.11*. At oral argument, counsel for Father, noting this holding in *Ivie*, specifically stated that Father would proceed solely on the argument that the judgment was not supported by substantial evidence. Counsel specifically waived any claim that the judgment was against the weight of the evidence.

the other parent often will lead to less frequent contact. Yet Missouri law does not make reduced frequency of custody of the nonrelocating parent a bar to relocation. To the contrary, section 452.377.9 makes "good faith" and "the best interest of the child" dispositive factors. It can be in a child's best interest to relocate with a parent to a different community when the trial court determines it is in the child's best interest to continue to live with that particular parent even though that parent's circumstances require the parent to move. Of course, adequate contact is required, but what is adequate is not measured by whether the contact after relocation will match that prior to relocation. Rather, section 452.377.10(1) states that if relocation is permitted: "The court shall order contact with the nonrelocating party including custody or visitation and telephone access sufficient to assure that the child has frequent, continuing and meaningful contact with the nonrelocating party unless the child's best interest warrants[ ] otherwise."

The trial court did determine that Father would have frequent, continuing and meaningful contact with the children after relocation. The trial court ordered that, during the school year, Father would have visitation at such times as the parties mutually agree and, starting on the first, third, fourth, and fifth Fridays of the month, from Friday evening until Sunday evening. The trial court ordered that, during the summer, Father would have custody of the children at all times except for certain weekends and a seven-day consecutive block. The parents would share holidays. In total, Father has 143 overnight visits, approximately 39 percent of all nights in the year.

The trial court further undertook a multifaceted inquiry applying the definition of "best interests of the child" in section 452.375.2 in determining whether the proposed

relocation is in a child's best interest. Although section 452.375.2 does not expressly govern the best interests inquiry in relocation determinations, it is proper for a trial court to consider the factors articulated in section 452.375.2 because those factors are equally relevant to the best interests inquiry in section 452.377. In this case, the trial court set out in detail how it used the factors in section 452.375.2, governing the best interests determination in child custody cases, to determine the children's' best interests. Section 452.375.2 provides that a court shall consider all relevant factors in making that determination, including:

(1) The wishes of the child's parents as to custody and the proposed parenting plan submitted by both parties;

(2) The needs of the child for a frequent, continuing and meaningful relationship with both parents and the ability and willingness of parents to actively perform their functions as mother and father for the needs of the child;

(3) The interaction and interrelationship of the child with parents, siblings, and any other person who may significantly affect the child's best interests;

(4) Which parent is more likely to allow the child frequent, continuing and meaningful contact with the other parent;

(5) The child's adjustment to the child's home, school, and community;

(6) The mental and physical health of all individuals involved, including any history of abuse of any individuals involved. If the court finds that a pattern of domestic violence as defined in section 455.010 has occurred, and, if the court also finds that awarding custody to the abusive parent is in the best interest of the child, then the court shall enter written findings of fact and conclusions of law. Custody and visitation rights shall be ordered in a manner that best protects the child and any other child or children for whom the parent has custodial or visitation rights, and the parent or other family or household member who is the victim of domestic violence from any further harm;

(7) The intention of either parent to relocate the principal residence of the child; and

(8) The wishes of a child as to the child's custodian. The fact that a parent sends his or her child or children to a home school, as defined in

12

section 167.031, shall not be the sole factor that a court considers in determining custody of such child or children.

The trial court carefully examined each of the above factors and concluded that relocation was in the best interests of the children. This conclusion was supported by substantial evidence. The trial court found in regard to the first factor – the wishes of the parents and the proposed parenting plans – that Mother's proposed parenting plan would preserve the existing division of labor, with Mother continuing her role in attending to the children's appointments, illnesses, and other needs, while Father would continue his role as the "activities" parent. Father's proposed parenting plan, in contrast, would have flipped the division of labor and would have, as the trial court explained, deprived "the children of their Father for summer baseball and other activities" – activities that the children "very much enjoy" sharing with Father. The trial court also found that the new school district would "not significantly deprive the children of a decent education."

As to the second factor – the needs of the children for a frequent, continuing and meaningful relationship with both parents and the ability and willingness of parents to actively perform their functions as mother and father for the needs of the children – the record included evidence that the children were already familiar with the Greenville/Silva area, which the trial court found would decrease any stress resulting from the move. The trial court also found the presence of family near Greenville would assist Mother in taking care of the children after the move. The trial court also explained that the denial of relocation would cause stress for the children because the children were already familiar with Mother's weekday routine but were only familiar with Father's weekend routine, not

his school routine.

The trial court also noted Mother and Father's near continual episodes of inappropriate behavior, detailed above, and explained:

> [E]ach parent has an extreme dislike for, or distrust of, the other parent. One problem with this is that both parents seem unwilling or unable to conduct themselves in an appropriate manner in the presence of the children. An atmosphere of distrust permeates nearly every dealing, whether it relates to visitation times, exchange times, picking up the children from the day care provider, and even the simple filling out of forms at a physician's office. Mother and Father each related incident after incident of arguments and other inappropriate conduct occurring in the presence of the children.

Mother and Father's behavior led the trial court to conclude that the second factor weighed in favor of relocation because:

> Neither parent is capable of actively performing their functions as Mother and Father *for the needs of the children,* if those functions involve any dealings whatsoever with the other parent. It is clear that while each parent needs time with the children, relocation to allow Mother to be further from day-to-day dealings with Father will undoubtedly, in combination with other changes to the Parenting Plan, reduce stress on the children and be in their best interests.

The trial court also found that the third factor – the interaction and interrelationship of the children with parents, siblings, and any other person who may significantly affect the child's best interest – did not work against relocation. As noted, the new location was near other family. For the fourth factor – which parent is more likely to allow the child frequent, continuing and meaningful contact with the other parent – the trial court concluded that, while both parents engaged in inappropriate conduct and extremely disliked one another, Father was more at fault. It also explained that Father's positive influence in his activities with the children, especially during the

14

summer, would continue with the relocation because relocation would:

> [F]acilitate each parent's strong suits with the children. Disallowing relocation will frustrate the division of labor, so to speak, established naturally by the actions of the parents, and will deprive the children of their excellent and undoubtedly memorable experiences with Father in the summer as Mother would be the "summer" parent if relocation is denied.

For the fifth factor – the children's adjustment to the child's home, school, and community – the trial court found that the Greenville/Silva area would not be unfamiliar to the children because they had visited Mother's parents there on many weekends and they already have friends in the area. For the sixth factor – the mental and physical health of all individuals involved, including any history of abuse of any individuals involved – the evidence included Father's difficult attitude toward A.J.P.'s ADHD diagnosis. The trial court stated: "Father did not initially administer the medication, but later began administering the medication … Father is still somewhat in denial that [his child] could have ADHD, and the Court notes that Father still gives the medicine only reluctantly." The trial court concluded that "Mother is more likely to administer the ADHD medicine." For the seventh factor – the intention of either parent to relocate the principal residence of the child – the trial court noted Mother's intent to relocate the children's principal residence to the Greenville/Silva area and her living arrangements in Silva – a house with a yard.

Taking all of this evidence[5] into account, the trial court determined that relocation was in the best interests of the children. That conclusion was supported by substantial

---

[5] For the eighth factor, the trial court simply stated: "Neither parent intends to home school either child as defined by Section 167.031, RSMo. Neither child testified. Both children love both parents."

evidence.

## B. Substantial Evidence Supported Modification of Legal Custody

This Court also rejects Father's contention that the trial court's decision to modify legal custody of the children from joint to sole legal custody in favor of Mother was not supported by substantial evidence. Section 452.410.1 states in pertinent part:

> … the court shall not modify a prior custody decree unless ... it finds, upon the basis of facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree, that a change has occurred in the circumstances of the child or his custodian and that the modification is necessary to serve the best interests of the child.

The trial court's decision to modify custody from joint legal custody to sole legal custody of the children in favor of Mother was supported by substantial evidence. "Under joint legal custody, the parents share the decision-making regarding the health, education and welfare of the child." *Leone v. Leone, 917 S.W.2d 608, 614 (Mo. App. 1996).* "[T]he parents' ability to communicate and cooperate is crucial in considering whether joint legal custody is proper." *Mehler v. Martin, 440 S.W.3d 529, 536 (Mo. App. 2014).*

Here, both Mother and Father presented evidence showing that they were not able to share in decisionmaking and could not function, communicate, or make decisions regarding issues involving the children. In particular, Father degraded Mother and her significant other to the children and Father displayed an unresponsive and difficult attitude toward A.J.P.'s ADHD diagnosis, creating a problematic joint-parenting situation. This included Father telling A.J.P. to inform Mother that A.J.P. would not take the medication and that the medication could cause him to die. In considering the

16

evidence, the trial court explained that, while "much of Mother's conduct toward Father … is not what any casual observer would call proper parenting techniques," sole legal custody should be granted to Mother because her "dealings with Father are so unpleasant that it is unreasonable for Mother to be expected to jointly parent the children with Father" and because she had "a proven track record of acting in the best interests of the children without incidents of demeaning the other parent or any significant others to the children."

By contrast, the trial court found, Father's misconduct had:

[O]ften been in front of or in the presence of the children and … had a pattern of conduct which demeans Mother to the children. In addition, Mother has tried to act in concert with Father with respect to appointments, medication and so forth, but Father has often not acted upon Mother's request for input and the Court notes that even after both a second and third opinion related to [his child's] ADHD, Father does not accept the diagnosis and only gives the medicine prescribed by the physician reluctantly.

This evidence showed a significant breakdown in communication and cooperation such that Mother and Father were unable to jointly parent the children. "If the parents are unable to make shared decisions concerning the welfare of the children, joint custody is not in the best interests of the children." *Mehler, 440 S.W.3d at 536.* The record contains substantial evidence supporting the trial court's determination that Mother and Father were unable to make shared decisions, particularly when it came to A.J.P.'s ADHD. Again, the fact that Father believes that his contrary evidence was more credible and should have been accepted[6] is irrelevant because this Court disregards contrary evidence

---

[6] Father cites his contrary testimony of Mother making appointments with physicians without consulting Father or a disagreement as to whether A.P.P. should have gone to the

17

and instead considers only whether the trial court's decision, considering all inferences in its favor, was supported by substantial evidence. *Ivie, 439 S.W.3d at 200.*

## IV. CONCLUSION

The judgment of the trial court is affirmed.

_____
**LAURA DENVIR STITH, JUDGE**

All concur.

---

hospital after getting hurt in a baseball game. Father also notes his concern that his younger child will not be able to go to religion classes on Wednesday evenings in Farmington after the move, and, therefore, will not have a shared common experience with the older child. But the order approving relocation requires that Mother bring the child to comparable religion classes in her new location, and the trial court was free to believe or disbelieve Father's evidence and to give it such weight as the trial court thought proper.